**McElwee v. Leber**

C.P. of Lycoming County, no. 00-01, 795.

*Clifford A. Rieders* and *C. Scott Waters,* for plaintiffs.
*David R. Bahl, Kenneth B. Young* and *Robert A. Seiferth,* for defendants Sinsabaugh, Kershner, Muncy Valley Hospital, Susquehanna Health System and Susquehanna Physician Services.
*C. Edward S. Mitchell,* for defendant Shearer.
*Alan R. Krier,* for defendants Leber, Edelman, Emcare, West Branch Emergency Physicians and New Jersey/Pennsylvania EM-1 Medical Services.

KIESER, *J.*, June 28, 2002—Before the court are preliminary objections of all defendants to plaintiffs' first and second amended complaints asserting wrongful death and survival actions on behalf of their daughter's estate and claims for damages on their own behalf attributed to negligent infliction of emotional distress. The original complaint was filed on November 15, 2000. After preliminary objections to that complaint were sustained, plaintiffs filed their first amended complaint on July 18, 2001 to which all defendants filed preliminary objections.

However, at argument, on October 24, 2001, all parties stipulated that plaintiffs could file a second amended complaint, that would be analyzed in conjunction with the first regarding the objections.[1] The second amended complaint was filed on November 9, 2001.

The preliminary objections of the defendants are broken down as follows:

(1) Defendants Jeanine Sinsabaugh, Cindy Koons, Judy Kershner, Muncy Valley Hospital, Susquehanna Health System, and Susquehanna Physician Services

---

1. The stipulation of record as set forth in the order of October 24, 2001, specifically gave plaintiffs the right to amend in order to add a count of vicarious liability against the asserted employers of defendants Dr. Shearer, Dr. Leber and Dr. Edelman. These additional counts are set forth as Counts XV and XVI of the second amended complaint. In doing so, plaintiffs also deleted original paragraph 12 of the first amended complaint and added new pleadings as to the defendants' employers as paragraph numbers 12 and 14 in the second amended complaint. This resulted in the allegations in the second amended complaint following paragraph 14 to numbered one number higher than in the first amended complaint. Otherwise, the first amended complaint and second amended complaint are the same.

(defendant hospitals), filed their preliminary objection, on August 7, 2001, a motion to strike plaintiffs' claims for negligent infliction of emotional distress set forth in Counts VIII and IX of the first amended complaint and which now will apply to the same counts of the second amended complaint.

(2) Defendants, Paul Leber M.D., Adam Edelman M.D., Emcare Inc. and West Branch Emergency Physicians filed preliminary objections on August 8, 2001, a motion to strike the claims of Kevin McElwee for negligent infliction of emotional distress, Count VIII of plaintiffs' first amended complaint. This objection will now pertain to Count VIII of the second amended complaint and include the added defendant New Jersey/Pennsylvania EM-1 Medical Services P.C., the asserted employer of Dr. Leber and Edelman, as an objecting party. This motion did not include any objection to Count IX in which plaintiff Jo Ann McElwee asserts an emotional distress claim against defendant Edelman and other defendants.

(3) Defendant Shearer filed preliminary objections on August 9, 2001, demurring and moving to strike Kevin McElwees' claim for negligent infliction of emotional distress set forth in Count VIII of the first amended complaint, which applies now to the same count of the second amended complaint. Defendant Shearer's objections also raised a motion to strike the negligence allegations in paragraph 44.1 of the amended complaint for lack of specificity. This objection now applies to paragraph 45.1 of the second amended complaint.

For the following reasons, (all) defendants' preliminary objections seeking to strike plaintiffs' negligent in-

fliction of emotional distress claim, Count VIII and IX, will be denied. Defendant Shearer's additional objection asking this court to strike paragraph 44.1 of plaintiffs' amended complaint will also be denied, as indicated at the time of argument.

## FACTS

Plaintiffs originally filed a complaint on November 15, 2000 alleging defendants' failure to diagnose and treat a strep infection that resulted in the death of Jessica McElwee, the 10-year-old daughter of plaintiffs, Kevin and Jo Ann McElwee, on December 16, 1999. Initial preliminary objections similar to those now under consideration were filed challenging plaintiffs' claims of negligent infliction of emotional distress and as to Dr. Shearer, two of the general negligence allegations made against him. Those preliminary objections were sustained through an opinion and order of June 29, 2001.

Plaintiffs filed their first amended complaint on July 18, 2001, repleading their claims for emotional distress and one of the negligence allegations against Dr. Shearer. While these preliminary objections were under consideration, plaintiffs, by virtue of a stipulation evidenced by a court order of October 24, 2001, filed their second amended complaint, which by the same counts assert the same negligent infliction of emotional distress claims in the same language as the first amended complaint and contains the same allegations of negligence against Dr. Shearer. (See also, text of footnote 1.)

The second amended complaint in paragraphs 2 through 31 set forth plaintiffs' general factual allegations of the events, which led up to the death of Jessica

McElwee. Count VIII and Count IX set forth the negligent infliction of emotional distress claims. Count VIII, consisting of paragraphs 65 through 81, identifies the claim as being that of plaintiff Kevin McElwee vs. defendants Leber, Shearer, Kershner and Edelman. This count incorporates all prior paragraphs. Count IX of the complaint in paragraphs 82 through 96 contains additional factual allegations in connection with mother, Jo Ann McElwee's negligent infliction of emotional distress claims against the three nurses, defendants Sinsabaugh, Koons and Kershner, as well as against Dr. Edelman. Count IX incorporates the preceding paragraphs of the complaint by reference. The following is a chronological sequence of events as pleaded and relevant to the preliminary objections. (Paragraph references are to the second amended complaint.)

*December 12, 1999 (¶¶16-19, 32-34, 51, 66)*

At about 5 p.m. on the evening of Sunday, December 12, 1999, Jessica McElwee, age 10, was taken by her father, Kevin McElwee, to the Muncy Valley Hospital emergency room due to pain in the left ankle area. Her symptoms also included, an upset stomach, and a fever of 102.7° F and tenderness of lateral malleous, as well as a moderately red throat. Defendant Nurse Koons was involved in her care. After an x-ray disclosed no evidence of a fracture or dislocation, defendant Dr. Leber diagnosed ankle sprain and viral syndrome. After approximately 2 hours, Jessica was sent home with instructions to take Tylenol or Motrin and to wear an air splint on her ankle. Kevin McElwee observed the medical care provided to Jessica on Sunday, December 12, 1999, on

the initial visit to the emergency room, specifically Dr. Leber.

*December 13th (¶¶20, 48-48.12, 83)*

Jessica did not improve. Jo Ann McElwee telephoned the emergency room and asked Defendant Jeanine Sinsabaugh, a nurse, to recheck the x-ray, explaining, inter alia, that she could not understand why Jessica continued to experience so much pain. Nurse Sinsabaugh indicated that Jessica's ankle was not broken and recommended Ibuprofen but did not instruct Jo Ann McElwee to bring Jessica to the emergency room and did not instruct that Jessica be seen by a physician.

*December 14th (¶¶21-24, 45-45.12, 67)*

Mrs. McElwee called Dr. Shearer's office and advised a person by telephone of Jessica's emergency room visit and that Jessica was not feeling better and had a fever and upset stomach; an appointment was made for Jessica to see defendant Dr. Shearer at 3:30 p.m. Kevin McElwee took Jessica to Dr. Shearer's office. Jessica was seen by defendant Dr. Shearer, who was informed of the events surrounding the December 12 emergency room visit. He took no vital signs. He removed the air splint causing Jessica intense ankle pain. The abnormal appearance of the ankle, purple with spider-like streaks, was pointed out to Dr. Shearer and a comment made to him that her ankle appeared similar to the way Kevin McElwee's leg looked when he had blood poisoning. Dr. Shearer remarked that no one dies from ankle pain, told the father the diagnosis of ankle sprain and flu and then

prescribed Jessica Imodium AD. Father observed the care Dr. Shearer rendered to her at that time.

*December 15th (¶¶25-28, 36-42.5, 45.13, 45.14, 53, 53.6-53.13, 56-56.7, 69, 70, 76, 84, 85)*

Mrs. McElwee again contacted the MVH emergency room and spoke with defendant Cindy Koons, who had been present at the initial visit. Mrs. McElwee told Nurse Koons that Jessica was not feeling any better and that Jessica's ankle was still swollen and requested stronger pain medication. Nurse Koons responded by telling Mrs. McElwee that sometimes a sprain can be a lot more painful for a child and that Jessica could be laid up for weeks and told Mrs. McElwee to call her family physician for stronger pain medication. She offered no other assistance. Mrs. McElwee heard, was aware, or later became aware at or near the time of Jessica's death, that defendant Koons failed to provide reasonable care, caused injury, and/or increased the risk of harm as follows: "telephone management of a critically ill child . . . failing to have a doctor speak with Jo Ann McElwee; by failing to instruct Jo Ann McElwee to bring Jessica to the emergency room . . . telling Jo Ann McElwee that a sprain was the cause of Jessica's symptoms; by failing to appreciate that Jo Ann McElwee's request for stronger pain medication was a clear sign that Jessica required immediate medical care; and by being dismissive of information and symptomatology." (¶84.)

Mr. McElwee then contacted Dr. Shearer and explained to him Jessica was still experiencing intense pain. Dr. Shearer prescribed Darvocet over the telephone and gave no instruction for any further evaluation or emergency

room treatment. Jessica was given Darvocet at 5:00 p.m. and at 9:00 p.m. as instructed by Dr. Shearer.

Later that night, Jessica began vomiting. Mrs. McElwee telephoned the MVH emergency room and explained Jessica's symptoms to defendants Nurse Kershner and Dr. Edelman between 11:30 and 11:45 p.m. She was advised Jessica was probably having a reaction to the Darvocet and would be fine. The emergency room personnel were dismissive of information furnished by Mrs. McElwee. During this call, after Kevin McElwee told Jo Ann McElwee that he was not able to find a pulse, Jo Ann McElwee told the emergency room personnel that Jessica would be transported by her parents to the emergency room. Jessica was then taken by automobile, by her parents, to the Muncy Valley Hospital emergency room. (¶¶70, 85.)

*December 16th (¶¶29-31, 71-76, 86-92)*

At home, while being transported, and at the time Kevin and Jo Ann McElwee arrived at the emergency room, Kevin and Jo Ann McElwee observed and/or were aware that Jessica's skin was mottled, her forearms were pale and cold, she was disoriented and mumbling, her extremities were cool, and she had no pulse. Mr. and Mrs. McElwee were aware that Jessica's life was in peril. (¶¶71, 86.)

Upon arrival Jessica was taken by her father into the emergency room by wheelchair and examined. At approximately 12:14 a.m., Jessica was examined at the Muncy Valley Hospital. In the emergency room, Jessica was seen by medical care providers including Dr. Edelman, nurses and paramedics. Kevin McElwee was

present to observe attempted medical care until the medical care providers no longer permitted Mr. McElwee to be present. (¶¶73, 88.) Jessica's examination in the emergency room revealed her skin was mottled with jaundice and cold to the touch. She was disoriented, mumbling, her extremities were cold, and she had no pulse. She was examined by Dr. Edelman who noted she was flaccid and obtunded. She vomited at 12:27 a.m. A code was initiated. She had no spontaneous respiration. She turned purple. She did not respond to treatment. After Kevin McElwee was no longer permitted to be in the immediate area where medical care was being provided to Jessica, he and Jo Ann McElwee remained at the Muncy Valley Hospital. Medical care providers, at times, did provide some limited information to Mr. and Mrs. McElwee while they waited. (¶¶73, 88.) Jessica McElwee died at 1:20 a.m. on December 16, 1999, at the Muncy Valley Hospital emergency room. Shortly after Jessica's death, Dr. Edelman, accompanied by Nurse Kershner, told Mr. and Mrs. McElwee that Jessica had died. The cause of death determined by autopsy was toxic shock due to streptococcal infection.

As to negligent infliction of emotional distress on Kevin McElwee by Dr. Shearer it is alleged:

"Kevin McElwee observed, heard, was aware, or in the alternative, became aware at or near the time of Jessica's death, that defendant Shearer failed to provide reasonable care, caused injury, and/or increased the risk of harm as follows: By prescribing a narcotic pain medication without again examining Jessica or without doing testing to determine the source of her pain and/or illness; failing to appreciate that Jessica's condition had

continued to deteriorate for approximately three days after she was first seen at the emergency room on December 12, 1999; failing to instruct that there be another office visit or that Jessica be seen in the emergency room or elsewhere by a physician; being dismissive of information brought to his attention by Kevin McElwee; being dismissive of obvious symptomatology such as the abnormal appearance of the ankle, intense pain, continuing fever, and other symptoms which continued for a prolonged period of time; and continuing to misdiagnose Jessica's condition." (¶69.)

The parents, in support of their emotional distress claims also include in their allegations that they had questioned or expressed concern regarding the appropriateness of the medical care rendered to Jessica by defendants Leber, Shearer, Kershner and Edelman. (¶¶77, 92.) The parents assert as to all defendants against whom they each were aware, or later became aware at or near the time of Jessica's death that defendants had failed to provide reasonable care, caused injury or increased the risk of harm to Jessica. (¶¶66, 68, 69, 75, 76, 83, 90, 91.) The parents claim that as a result of their contemporaneously perceiving by sight and sound the negligent medical care and treatment rendered to Jessica he suffered and continues to suffer serious and permanent emotional distress and anguish which was foreseeable by defendants suffering physical manifestations including depression, loss of sleep, nightmares, personality changes, headaches, upset stomach/nausea and flashbacks. (¶¶78-80, 93-95.) The parents assert that as a result of defendants' negligence they experienced or observed Jessica's deterioration and eventual death, a discrete or identifiable traumatic event, which directly and proximately resulted in

their suffering and continuing to suffer serious and permanent emotional distress and mental anguish. (¶¶81, 96.)

The negligence claims against Dr. Shearer are set forth in Count 3 of the complaint, specifically in paragraph 45, which consists of subparagraphs 45.1 through 45.18. The assertion, which is the subject of Dr. Shearer's motion to strike because of lack of specificity, is found in paragraph 45.1 which states as follows: "45.1 Failing adequately to examine and evaluate Jessica, as set forth herein, beginning December 14, 1999."

## DISCUSSION

This opinion will first address, collectively, all defendants' preliminary objections, which request the court to dismiss Count VIII and Count IX of plaintiffs' first amended complaint. These issues relate to plaintiffs' claims against defendants for negligent infliction of emotional distress. Second, the opinion will address defendant Shearer's preliminary objections to dismiss paragraphs 44.1 and 44.6 of plaintiffs' amended complaint for lack of specificity.

### Negligent Infliction of Emotional Distress

Count VIII sets forth the claim on behalf of plaintiff Kevin McElwee, plaintiff father, against defendants Leber, Shearer, Kershner and Edelman. Count IX sets forth the claim on behalf of plaintiff Jo Ann McElwee, plaintiff mother, against defendants Sinsabaugh, Koons, Kershner and Edelman.[2]

---

2. As noted at page 381, defendant Edelman did not file a preliminary objection to this allegation.

The essence of defendants' objections to the negligent infliction and emotional distress claims is that there are no facts pleaded asserting that either of the plaintffs/parents witnessed an identifiable traumatic event, that they recognize that the conduct of the medical care providers was negligent at the time it was occurring, that becoming aware after the medical care was rendered does not support a negligent infliction of emotional distress claim and also concerning the allegations that plaintiffs/parents became aware later at or near the time of the death of their daughter is an insufficient pleading and further plaintiffs cannot determine if plaintiffs were talking about becoming aware of the negligent nature of the care before the death, at the death, or after the death of Jessica.

The Pennsylvania Supreme Court in *Sinn v. Burd,* 486 Pa. 146, 170-71, 404 A.2d 672, 685 (1979), set forth the following factors that are necessary to state a cause of action for negligent infliction of emotional distress:

"(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it.

"(2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence.

"(3) Whether plaintiff and the victim were closely related as contrasted with an absence of any relationship or the presence of only a distant relationship." See also, *Love v. Cramer,* 414 Pa. Super. 231, 234, 606 A.2d 1175, 1177 (1992).

"Recovery is further limited by the requirement that the person seeking damages must suffer a physical in-

jury as a result of actually witnessing the harm to the close relative. *Mazzagatti v. Everingham by Everingham,* 512 Pa. 266, 516 A.2d 672 (1986)." *Id.* This court is satisfied that the second amended complaint's allegations read in their totality, in a common-sense manner, assert facts upon which a jury could award damages for the emotional distress suffered by the parents.

Factor number one deals with whether plaintiff father and mother were located near the daughter when she was injured. The complaint asserts at various times that mother and father witnessed the care of the various defendants that rendered to their daughter, communicated orally with the defendants about her condition and care, and they were in her presence when the care was being provided. More significantly in this regard, it appears from the allegation Jessica was in the presence of one or both of them from the onset of her complaint on December 12 through the continuing deterioration of her condition, to the point that she became unconscious, disoriented, mumbling, cold and without a pulse on December 15. In the early morning hours of December 16, Jessica's parents drove her to the emergency room where she was treated by the staff, specifically Dr. Edelman and Nurse Kershner. Jessica died a little over an hour after arrival. The complaint does not assert any act of medical negligence occurring in connection with Jessica's care in the emergency room in the hour preceding her death. The complaint asserts, however, that at least her father was present with Jessica at the time the hospital alerted a code and attempted final measures of resuscitation, which proved futile. Mother's immediate whereabouts, except for the fact she had accompanied the daughter to the emergency room this final time and had observed her

there is not made clear by the allegations of the complaint.

As in most emotional distress cases, particularly those involving claims of medical malpractice, the real issue in this case is whether the pleadings are sufficient to satisfy the second test of *Sinn v. Burd,* that is, do the parents sufficiently allege shock resulting from direct emotional impact upon them from the sensory and contemporaneous observance of harmful (accident), conduct of defendants as contrasted with learning of the injury-producing event, the inappropriate medical treatment from others, after its occurrence. The complaint clearly does allege plaintiffs knew of each specific act of medical care being rendered to their daughter. The defendants' objections emphasize that the complaint does not allege that at the moment each act of care was provided the parents recognized such care as being negligently provided.

In applying the *Sinn* tests there should be a focus on whether the plaintiffs personally observed the events, as opposed to learning about them from someone else. *Mazzagatti v. Everingham by Everingham,* 512 Pa. 266, 516 A.2d 672 (1986). In determining what it is a plaintiff must observe it has been recognized that it is a traumatic infliction of injury by the defendant upon a close relative, without a buffer of time or space to soften the blow. *Bloom v. DuBois Regional Medical Center,* 409 Pa. Super. 83, 105, 597 A.2d 671, 682 (1991). *Bloom* found there was no injury inflicted on the plaintiff's wife by the defendants because the wife harmed herself through an attempted suicide, but the Superior Court noted there could be a circumstance where a medical care omission, witnessed by a plaintiff, could be construed as

a traumatic injury to the relative. *Id.* at 105, 597 A.2d at 683.

*Love v. Cramer, supra* at 232, 606 A.2d at 1175, *appeal denied,* 533 Pa. 634, 621 A.2d 580 (1992), in ruling upon almost the exact factual scenario envisioned by *Bloom,* held that a daughter who had witnessed her mother's fatal heart attack had experienced a sensory and contemporaneous event. *Love v. Cramer, supra* at 235, 606 A.2d at 1177. *Love* further held:

"The fact that the negligence . . . did not take place at the time of the actual injury should not prevent . . . (plaintiff) from attempting to prove her claim. It is enough if the negligence constituted the proximate cause of the injury and of the resulting emotional trauma." *Id.* (footnote omitted)

Commenting in a footnote that although it seems odd that law requires a plaintiff to actually observe the negligent conduct, *Love* found the observance of the negligent failure to treat a loved one, being present when tests were not done and witnessing the subsequent heart attack, six weeks later, made it possible for plaintiff to pursue her claim for negligent infliction of emotional distress. "Her recovery, if proven, would be based upon her first hand observation of her mother's heart attack, an event caused by Dr. Cramer's negligence, of which she also witnessed." *Id.* at 237, 606 A.2d at 1178.

Here the complaint clearly alleges that the treatment of defendants was negligent and various aspects of the care rendered and that as a result of this negligence plaintiffs' deceased daughter suffered injuries and eventually death. The complaint alleges that plaintiffs as the girl's parents observed contemporaneously the medical care

that was being provided. The complaint when fairly read also asserts that plaintiffs were concerned and upset about what they considered to be inappropriate care. As would relate to Dr. Shearer, the complaint clearly asserts that following the initial treatment of Jessica at the emergency room where she was diagnosed with flu and a sprained ankle that the parents questioned this diagnosis and telephoned the emergency room asking that the x-ray be rechecked. Their concern continued as Jessica failed to respond to the initial instructions to take Tylenol or Motrin and wear an air splint and they advised Dr. Shearer the circumstances leading up to their taking Jessica to his office. They allege a concern was that it appeared her ankle presented symptoms relating to blood poisoning, which was dismissed with Dr. Shearer remarking that one does not die from ankle pain. The parents were concerned, upset and felt the treatment was wrong as evidenced by the actions of the parents on December 13 when they re-contacted the emergency room and Dr. Shearer. The complaint clearly alleges that the parents felt their concerns and complaints were being dismissed by various defendants. Even shortly before Jessica lapsed into the state where she had no ascertainable pulse at home it appears that the parents viewed the treatment and advice they were getting from the emergency room personnel and their late-night telephone call was not sufficiently rendering care to their daughter. In paragraphs 77 and 92, plaintiffs allege they questioned the inappropriateness of Jessica's care and expressed concerns.

This court also believes the complaint as a whole presents facts, which if true, not only coincide closely with *Love v. Cramer, supra,* but state a scenario where com-

mon sense dictates a parent may logically suffer emotional distress from their 10-year-old daughter being injured by the medical care given, or in this case, not given to her. As Jessica becomes cold, mottled and without a pulse at her home in her parents' presence, certainly they could have suffered a traumatic shock. Having observed Jessica's condition develop over the preceding few days it is reasonable and logical that Jessica's parents would become aware that the care defendants had been given was incomplete or wrong and upon this realization become greatly emotionally upset. Their adverse emotional impact would certainly be enhanced when, as the parents pled, they recognized Jessica's life was in peril and it was in peril because of the lack of proper treatment. Such awareness of the care, the injury and recognition of the wrong done to their daughter is sufficiently contemporaneous and sensory to meet the standards of Pennsylvania law for stating a claim for negligent infliction of emotional distress.

Defendant Kershner also argues that the facts pleaded do not state Father, Kevin McElwee, ever talked with her or observed her caring for Jessica. The complaint does generally assert, however, that he was aware of the care being provided by defendant Kershner when the nurse was talking on the telephone with his wife. Granted, the pleadings do not establish that he knew the identity of the person of Nurse Kershner at the time, but it is clear he contends in the complaint facts sufficient to infer he knew care was being provided by someone during his wife's call to the emergency room. See *Persall v. Emhart,* 599 F. Supp. 207 (E.D. Pa. 1984) (allowing a mother's claim for emotional distress against the manufacturer of a defective alarm system, although obviously

not knowing the identity of person who caused the defect).

Whether or not a particular medical care provider acts negligently or not is always a difficult question. Indeed, in many cases, even experts disagree as to whether or not it is negligent. To put a burden on plaintiffs in a case such as this to be able to say that they were fully aware at the time the medical care was provided that it was negligent is unrealistic and also not required. What is required is that plaintiffs plead an awareness that what was happening to their daughter was wrong and that they recognized that there was something wrong or lacking at the time that the care was provided. The parents clearly assert that: they were concerned about the medical care which was being rendered and/or the lack of care rendered; defendants were being dismissive of Jessica's symptoms and the complaints being made by and on behalf of their daughter; they observed these acts of medical negligence and the injury to their daughter. Both *Bloom* and *Love* clearly recognize that omission of care might be construed as traumatic infliction of injury. That is essentially what plaintiffs in this case allege. Here plaintiffs allege similar to that situation envisioned by *Bloom* and found in *Love,* that their deceased daughter languished while under care of defendants. Thus, languishing was not just for a short period of time in an emergency room, as set forth in the *Bloom* scenario, but over a period of three days after initial negligent care was given to Jessica on December 12. During each day Jessica continued to exhibit symptoms of her illness and did not respond to the prescribed treatment. She did not improve due to the inappropriate omissions of care by defendants. Thus, the negligence and the resulting in-

jury were separated by at most four and one-half days and at the least hours, contrasted with the six weeks of separation, which existed in *Love.* See *id.,* and also *Bloom* at 105, 597 A.2d at 683.

As in *Love,* plaintiffs assert a negligent failure to treat a loved one. They plead specific times that they observed the omissions of medical care, which they may be able to prove was in fact negligent care and was the proximate cause of their daughter's death. The observance of this lack of medical care together with their being present when their daughter lost her pulse and became cold and mottled is sufficient to sustain their claim of negligent infliction of emotional distress. See *Love v. Cramer, supra* at 237, 606 A.2d at 1178. As recognized in *Love,* whether or not plaintiff can prove the causal connection between their emotional distress injuries and alleged negligence is something that can be determined at trial but they should be given the opportunity to do so.

Defendants argue, however, that plaintiffs' complaint must be dismissed in view of the controlling Lycoming County decision in *Trimble v. Beltz,* CV-98-01720 (Lyc. Cty. C.P. 11/12/99). *Trimble,* according to defendants, requires a plaintiff to recognize a defendant's act or omission as being negligent at the time the act or omission occurs to sustain a negligent infliction of emotional distress claim. See *e.g.,* defendants Sinsabaugh, et al. brief, filed 10/3/01, pp. 4, 5. In support of this objection defendants point to the frequent allegations of plaintiffs which state they observed the medical care provided by a defendant and that they observed, heard, were aware, or *became aware at or near the time of Jessica's death* that defendants failed to render reasonable care or in-

crease the risk of harm of the injury to Jessica. *Trimble* does state that observing negligence can only be traumatic if the plaintiff recognizes the negligence at the time. However, in further explaining the requirement *Trimble* indicates the plaintiff cannot simply witness the negligence but must suspect something is wrong in order for the observation to be traumatic.

More importantly, however, this court does find the criticized plaintiffs' pleading as to observing the care and being aware or later becoming aware at or near Jessica's death that the care was negligent satisfies the *Trimble* criteria when read in conjunction with the other fact allegations. Unlike the prolonged treatment time in *Trimble,* the total time of care being rendered to Jessica was within four and one-half days of her death. Not only do the questioned paragraphs assert an awareness of negligence when the care was provided but an awareness that is contemporaneous enough with her deteriorating condition due to an ongoing failure to treat to satisfy the *Trimble* standard. This is substantiated by the companion pleadings, which specifically state that plaintiffs questioned and were concerned about the appropriateness of Jessica's care. See inter alia, ¶¶62 and 72. Specific factual allegations establish they did question whether her diagnosis was correct and easily could support a finding that the parents suspected something was wrong in the medical treatment being given to Jessica.

From the foregoing it is also obvious that the third factor that plaintiffs were closely related to the person injured is established in the pleadings. The pleadings also assert that plaintiffs themselves suffered identifiable and specific injuries as a result of this emotional distress.

Accordingly, all the factors established by our appellate courts having been met, the preliminary objections to Count VIII and Count IX of the first and second amended complaints, by the various defendants will be denied.

### Defendant Shearer's Motion To Strike

Defendant Shearer's next preliminary objection asks this court to strike paragraph 44.1 of plaintiffs' first amended complaint for lack of specificity. This court issued an opinion and order on June 29, 2001, striking these paragraphs as pleaded in the original complaint because they were broad, open-ended and inappropriately alleged general terms of medical negligence. Plaintiffs' first and second amended complaints sufficiently correct the original allegations. Plaintiffs' original complaint read, "failing adequately to examine, evaluate, and treat Jessica beginning December 14, 1999" (filed November 15, 2000, p. 14, paragraph 44.1). Such an allegation, as initially argued by defendant Shearer's counsel, would permit plaintiffs to subsequently introduce testimony far beyond the specific facts of their complaint and do not adequately put the defendant on notice of what factual matters he may need to consider nor what claims he must be prepared to defend in the litigation. Plaintiffs' amended complaints were changed to read, "Failing adequately to examine and evaluate Jessica, *as set forth herein,* beginning December 14, 1999." See ¶45.1 of the second amended complaint. (emphasis added) This amendment makes the paragraph more specific, and adequately sets forth the negligence, limiting plaintiffs' allegations to the facts alleged in the foregoing paragraphs

of the first or second amended complaint, which the defendants can admit or deny and in the course of litigation prepare to defend.

## CONCLUSION

Plaintiffs' complaint sets forth facts sufficient to support the legal elements of their causes of action for negligent infliction of emotional distress. The complaint also states the negligent acts, which support the claims made against Dr. Shearer. The complaint gives defendants fair notice of the claims and the grounds upon which they are based. The facts alleged clearly state to the defendants what they must defend and permit them to adequately answer and defend plaintiffs' contentions. Therefore, the preliminary objections must be denied.

## ORDER

It is hereby ordered that all defendants' preliminary objections to plaintiffs father and mother's negligent infliction of emotional distress claims, Count VIII and IX, are denied.

Defendant Shearer's preliminary objection asking this court to strike paragraph 44.1 of plaintiffs' first amended complaint and 45.1 of the second amended complaint is denied.